The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Any persons having any, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and His Honorable Court. Good morning. Welcome to the Fourth Circuit. Please be seated. Judge Keenan, can you hear us all right? Yes, I can, Judge Agee. Thank you. We're ready to have argument in our first case, Maryland Shall Issue v. Moore. Mr. Nardone, I'll be glad to hear from you. Thank you, Your Honor. Good morning, Your Honors. I may have pleased the Court. My name is Mark Nardone. I'm here today to argue on behalf of the plaintiffs and appellants in this case. At the outset, it is critical that we distinguish what is and is not at issue in this appeal. This appeal is not about the constitutionality of background checks. This appeal is not about the constitutionality of what may or may not be required of an individual seeking to carry a firearm in public. What this case is about is whether or not the government may require law-abiding responsible citizens to obtain permission from the government to be able to undergo a background check that permits them to acquire a handgun. Your Honor, it's under the standard that was set forth in— Can I ask you, why are you going that far? It seems to me that your argument instead is that they can't do this, which is a narrower question. You said it may require permission at all, but what they've done here is they're requiring permission after waiting 30 days. So it might well—at least help me understand—it might well look different if that permission was virtually instantaneous. So if there was a computerized background check that was done in some form or fashion that was virtually instantaneous, didn't require them to leave the store, for example, that might be a different constitutional problem than one that takes 30 days. That's absolutely right, Your Honor, and it's also critical that the handgun qualification license, what is at issue in this case, does not allow an individual to acquire a handgun in of what exactly occurs when a law-abiding citizen seeks to acquire a handgun in Maryland. In Maryland in 1966, enacted a law that required enhanced background checks for individuals who wish to purchase, at issue here, handguns. That involves the provision of a social security number, a driver's license number, your address, all manner of identifying information. It requires a seven-day waiting period, and it also, as of 2000, requires—required—a viewing of a one-hour video. All of that is still required, and that is the process that an individual who wishes to acquire a handgun needs to undergo, and that— So I understand you have not yet challenged that requirement. That has not been challenged, Your Honor. That is not at issue in this case I'd be sure I understand the factual context here. If I'm a citizen of Maryland, and just suppose someone has threatened me or my family, and I want to obtain a handgun to defend myself in my own home, I have to wait the seven days and then the 30 days, be fingerprinted, get the background check, pay the fee before I can obtain the firearm. It's actually an even longer process than that, Your Honor. The way that it works in Maryland currently is that before you are able to file an application for a handgun qualification license, you are required to attend training that lasts a minimum of four hours and can only be conducted at a location that allows for the discharge of live ammunition, thus prohibiting in the major city in Maryland, Baltimore— Who pays for them? Who pays for them? That is paid for by the individual seeking the license, and the fee is set by the trainer. It is not set by statute. The discovery in this case indicated that the fees can range upwards of hundreds of dollars. After that training is completed, the individual receives— How available are those sites? That would depend on the availability of the trainer themselves. So the way that it is at locations, and that is dependent on— Hold on just a second, counsel. Rachel, we're not showing any time here. Oh, it's up on the screen there, sir. Oh, I got it. All right. Thank you. Bye-bye. Go ahead. Of course, Your Honor. They are as available as the instructors are. Now, I will candidly admit we do not have evidence in the record as to whether there are gaps, but we do know that there is an issue that individuals who are in Baltimore City, for example, cannot simply travel to a close-by site for their training because they must go somewhere that permits them to discharge a firearm under the regulations adopted by the Maryland State Police. So what about the fingerprinting? Does the applicant have to pay for that? They do, Your Honor, and that is also not a fee set by statute. The fingerprinting is also required before the handgun qualification license application can be submitted. Where do you do it? You can do it at any one of the state's live scan vendors, which are all privately operated, and they can charge whatever fee that they wish. Mr. Nardone? Yes, Your Honor. I'd like to consider your argument in the context of Justice Thomas' and the Supreme Court's footnote number nine in Bruin, and it seems to me that the court laid out a path for us to consider in terms of shall-issue regimes. In other words, laws that have a narrow objective focus rather than the kind of discretion that was at play in Bruin, where the court would make you just cause and the state could turn you down anyway. And so I think the Supreme Court in footnote nine was saying that in the case of a shall-issue regime, where the criteria are narrow and focused, that there isn't a problem unless there is a too lengthy waiting period or an a catch phrase at the end saying that there can be conditions that make a shall-issue law unconstitutional, even though shall-issue laws generally will pass constitutional muster. So take us analytically through footnote nine and with your argument. Is your argument solely then that these conditions are too exorbitant as to fee and too lengthy as to waiting period, and that's what renders it unconstitutional, and that if the waiting period were shorter and the fee was lesser, it would not be? Your Honor, I think there's a few things there. I'm happy to address that. Number one is I think that the test that's set out in Bruin that must be to happen is the text, history, and tradition test. And under that test, if the challenged law is a novel attempt at addressing an old problem, it is unconstitutional. If the challenged law could have been acted at the time of gratification, there's no question that had the government wished in 1791 to enact legislation that would require citizens to obtain permission before undergoing a background check, which establishes whether or not they are permitted possessor, then they could. And there is simply no historical tradition of that. Footnote number nine, Your Honor, I would say does not go as far as to countenance all shall issue jurisdictions or statutes. Rather, it is an acknowledgment that what was at issue in Bruin was a particular problem, the problem of government discretion. And so there's that number nine. And do we have government discretion here or do we simply have a waiting period that is too long in your view and a cost to qualify as too expensive? Your Honor, I don't think it comes into the purview of footnote number nine because we are not dealing with the same situation of licensing that we were dealing with in Bruin. Exactly. And that's what footnote nine is saying, that although the court in the New York statute in Bruin was called to pass on a May issue statute, what the court is saying, nothing in this analysis shall cause us to question the constitutionality of shall issue regimes unless they are exorbitant in fees. In fact, the court even says that fingerprinting requirements and background training are not a problem unless the fees are exorbitant and the waiting periods are excessive. I mean, the court very clearly in that footnote talks about fingerprinting and says that that's not a problem unless there are barriers imposed by the state. So it seems to me that based on this this isn't correct if it isn't, but it seems to me like based on this footnote, there's a different kind of analysis that the Bruin needs to be tweaked a little bit because the majority opinion in Bruin dealt with a May issue regime. We have a shall issue. In other words, if you pass the cause, the state's got to issue it. And so are you agreeing then that footnote nine puts your argument in the category of saying that the fees are too much and impose too great a burden and the waiting period is too long? Not at all, your honor. I'm saying that this case does fit within that framework whatsoever because the license that we are talking about is fundamentally different than the license that was at issue in Bruin. Right, but I'm asking you about footnote nine. Footnote nine is drawing the distinction with the majority holding in Bruin and talks about fingerprinting and talks about training. And you haven't addressed footnote nine. Would you please address your argument in the context of footnote nine? Thank you, your honor. In Bruin, the license at issue allowed... Perhaps another way to ask that question is footnote nine a generic second amendment framework or is footnote nine directed to that case, which was a public carry case? Your honor, I think that it is different for a number of reasons. Number one, there's obviously a difference between licenses to carry and licenses to possess because the interests that are at issue are different when you are carrying outside the home and versus not. However, we need to make clear that the license at issue in Bruin permits an individual to carry a firearm as soon as it is issued. And the license here is not that. That is why it is fundamentally different than what was at issue in Bruin. And that is why footnote number nine does not have relevance to this particular case. What we are dealing with here is not a license that permits someone to acquire a firearm. If you have a handgun qualification license and you receive it in the mail on Monday morning and you immediately go to your closest federal firearms licensee and you attempt to buy a handgun, you cannot do it. You cannot walk out of the store that day with that handgun. It is not the same license. Rather, what this license does is it permits an individual to undergo the background check that ostensibly determines whether or not they are permitted to acquire a firearm. And we know that because when one goes to purchase it, the provision of the handgun qualification license is insufficient to permit them to walk out the door with their handgun. So your honor, I don't think footnote number nine here is controlling. But moreover, I think footnote number nine is more narrow than that. I think what it is saying is that issue before the court in Bruin was whether or not may issue licenses are permissible. And therefore, there is no reason for the court's decision to have had any impact on shallow jurisdictions. I think that is all that footnote number nine is saying. And at the end, it obviously allows for challenges where a shallow jurisdiction could still violate the Second Amendment. I think that, your honors, is a recognition that regardless of whether this is a may or shall issue case, what the court needs to look at is the effect of the law and whether or not the effect of the law is to impose an unconstitutional burden on the right to acquire a handgun. And in this case, like every other Second Amendment case, the mechanism by which that determination is made is evaluating the historical tradition of firearms ownership and the rights afforded by the Second Amendment. Your honors, there is no historical, analog, tradition, or anything related to the idea that an individual needs permission from the government to be allowed to undergo the background check that determines that they are, in fact, eligible to possess a firearm. This is akin to requiring a permit for a gun. Mr. Nardone, briefly before you sit down, is your position that the different requirements of the statute are severable? No, your honor. I don't think they are. They have to rise and fall together, and why is that? I think that the entire handgun qualification license scheme is, in effect, unconstitutional for the reasons that I said. It is not permissible to require—your honor, may I finish? I see my time is finished. Go ahead, please. It is not permissible to require an individual, under the auspices of ensuring that they are not a prohibited person, to first seek out permission from the government to be able to undergo that but the individual components, the fingerprinting, the class, those are unconstitutional in and of themselves because there is no historical tradition of those, but the entire statute itself is unconstitutional, your honor. Yes. Okay, and let me ask you just one other thing for you to consider on rebuttal. Should this case be remanded to the district court to make the determinations that you're asking a court to make today? Your honor, I'm happy to answer that now, but if you prefer, I can wait to rebuttal. Go ahead, that way your opposing counsel can have the benefit. Your honor, no, I don't believe a remand here would be appropriate. We are dealing with a question that involves legislative, not adjudicated facts. This case was briefed after Bruin came down. The government was able to provide whatever citations to whatever sources that it felt was necessary to meet its burden under Bruin to demonstrate the constitutionality of this case. On remand, any issue would be under the same evidence that it would have presented here and any appeal from that remand would be de novo by this court. I don't see any situation in which a remand would do anything other than waste judicial resources to arrive back here at the exact same posture that we are now. Your honor, unless there are any other questions, I would reserve for rebuttal. All right, you've got rebuttal time. Thank you, Mr. Dietrich. Your honor, may it please the court. Can you start with the last two questions that Judge Keenan asked of your colleague? And the first being, who bears the burden to establish severance? Have you argued that this statute is severable? And if you haven't argued it, can you help us understand why we should consider a severance or severability argument at this particular stage? Second, the question that Judge Keenan asked your colleague about remand, I noticed in your brief here, you did not ask for a remand. At no point did you request a remand. And it stands in stark contrast with the same brief or similar brief you filed in Bianchi within a week of this brief, where you did ask for a remand. And so I sort of take that as been a conscious choice to not ask for a remand, given the proximity of two briefs from Maryland, both addressing Second Amendment cases, both following Bruin. But wanted to give you a chance to comment on both of those. I'll take the remand question first, which is that to the extent there's evidence necessary to resolve the question, I think it's in the brief and in the record below. There was discovery. There was no discovery in Bianchi. None at all. No, I understand. I think that's right. I just wanted to make sure that I wasn't missing something from yours. But your discovery was before the Bruin decision. In this case, yes. Yes, it was. So there would have been no reason to have elicited the information that Bruin would seem to require. But I think we're talking about two different things, possibly. In Bianchi, we were talking about evidence of the historical tradition at issue there, and whether there were statutes that supported restrictions on types of weapons. And that was the... And also the empirical question of whether these firearms were in themselves in common use. I mean, that's an empirical question that evidence had not been developed on in the record below. That's correct. And their utility for self-defense and things of that nature that went to that historical tradition. Here, the discovery down below was about whether this burden was onerous on the applicants. And what the evidence showed was that when we compared pre-HQL, Pre-Firearm Safety Act of 2013, and post that act, we saw that people were getting handguns at a higher rate. How does that relate to the Bruin standard? It relates to the Bruin standard because... Well, there's a few Bruin standards, I think, floating around here. The Bruin standard of history and tradition is one thing. The Bruin, what we'll call... You've got to cross that bridge first. And I understand that. And the brief is quite sparse on historical analogs in the founding era. The historical tradition here... Let's see, Judge, I'll answer your question. No, please. I'm sorry. Answer Judge Agee's question first. The historical tradition is the substantive limitations that are furthered by the HQL law. And those are ensuring that dangerous, subversive, non-virtuous, however you want to describe it, folks do not get deadly firearms. And ensuring that the tradition of firearm competency that was alive and well at the founding before that... What founding era analog do you have from any of the states that a citizen was required to have a permit from the government before they could have a handgun in their hand? The historical analogs relate to the substantive limitations that are part of the robust historical tradition of the Second Amendment. Well, why don't you give us an example? We look at laws from the founding that related to individuals who were required to take a loyalty oath or be disarmed at the time of the founding. We look at... But that's after the fact, right? So, if you don't do something, we're going to take your gun from you, right? So, for example, if you commit a felony, we will then require you to turn your guns in. All right. That's fine, but that's not preclearance, right? No, and I understand that. If I could just get out that when I talk about two Bruin standards, the second Bruin standard is the one that's in footnote nine. Right. So, I want to go there. I still want you to come back and talk to me about whether you've tried to assert severability, but if you want to go to footnote nine, your argument, as I understand it, is that footnote nine is an exception to Bruin's history and text test, that we don't have to look at history and tradition, that the whole opinion in Bruin carves out an exception in footnote nine and says a different standard applies. Is that how you're asking us to read footnote nine? No, it's not. How we're asking you to look at it is that we want you to look at history and tradition. Bruin commands us to do so, and that history and tradition is talking about how it's furthered by the HQL license in respect to two historical traditions. One is restricting those who are dangerous or contrary to public safety from getting handguns, and two, a robust historical tradition of firearm competency and requiring responsible citizens to get to be trained in the use of firearms. So what's that have to do with the analogs they talk about in Bruin? I'm still waiting for any remote founding era statue that had a restriction similar to what we have here. And I understand your question. Well, do you have one or not? We do not have any. We were unable to find any that required advanced permission, but when you look at what Bruin is saying, Bruin is giving us the roadmap in footnote nine about what states are able to do vis-a-vis substantive limitations. Separate from history. So in other words, you have no history, but this footnote which says this other case exists out here that's not before us, that you want us to apply that standard instead of the 50 pages of analysis that the court actually engages in. Like skip the history and just use this exception to the Bruin test. We are not saying it's an exception to the Bruin test. I think you are. I mean, I know you don't want to use that word because it's pejorative, right? Like I'm using it for that reason, but how is it not an exception if you're saying, yeah, we've got no history, but look at footnote nine, right? But look at footnote nine. It creates a different path, right? I think earlier it was referred to as a different analysis, right? But it was the statement that was made. There's different analysis that's in footnote nine. But the Bruin footnote nine path requires history and tradition as a fundamental premise of the substantive limitations that are being addressed there. And I think that's the message that Justice Thomas, the majority in that case, and Justice Kavanaugh and the Chief Justice in the concurrence were saying that when you have substantive limitations, you can have procedural mechanisms to enforce them. That's what Judge Easterbrook said in the 7th Circuit. Can you turn to the severability and just help me understand? Do you make the argument that the statute is severable? And do you agree that it's your burden to do so? We didn't address severability in our briefing. Our position is that the law is constitutional as is, because it is a regulatory scheme. But it rises or falls again. I think that's... Mr. Dietrich, you can't concede an issue of law as to severability. But I want to ask you a question about that. It seems to me that, and I think Judge Richardson makes a really good point, the Supreme Court is not taking back the requirement of historical analysis. I suggest to you that what footnote 9 is doing is saying that in a case you have a shall-issue regime and the criteria are narrow and objective, then you have to make a determination of infringement. The Second Amendment talks about infringement. And they didn't have to consider nuances of infringement in Bruin, because the government controlled everything. It had complete discretion, so automatically there was per se infringement. But here the issue in infringement has to be considered along with historical tradition. Seems to me that that's what they're saying. And if that's the case, and if evidence on remand shows that there is a historical basis for keeping dangerous people from having weapons, but there is no historical basis for requiring training of firearms, why wouldn't the statute be severable? Your Honor, I just admit I'm not necessarily prepared to address severability. It wasn't something that we argued. Can I ask you about, you know, Judge Keenan asked you about infringement. And one of the arguments you seem to suggest here is that this doesn't infringe on, you know, Judge Agee's hypothetical law-abiding citizen who's threatened and wants to buy a gun to protect himself. He's got to wait 30 days plus, right? Exactly what the number is doesn't matter. 30 days for this, seven days for that, something else for another thing, but 30 days plus. Is your argument that that time period where he cannot buy the firearm to protect his family and his home is not an infringement of his Second Amendment rights, the law-abiding citizen's rights, right? Not the person that you claim you're targeting, but let's posit hypothetically that he's a law-abiding citizen and he wants to protect his family. He's got to wait 37 plus days to get it. Is that not an infringement of Second Amendment rights? Well, first, I just want to push back on the 37 days. The 30 day in the statute is actually a maximum that can exist. All right, you want to call it 13 days. Pick a number you want to, right? Sure, I just wanted to make sure that that was understood. Whatever number you want to pick, right? 13 days. If he had to wait 13 days, is that not an infringement? I would quote, it affects Second Amendment rights in the sense that... It denies him his right for 13 days, right? He has no right to possess a firearm for 13 days. And that's correct, but it's... And is that it? That's what I'm trying to get at. Is that an infringement of his Second Amendment rights? No, because what you're saying is a legal conclusion.  All right, so let me ask a different question. So imagine you've got a community and you think a crime's about to occur. And so you go to that community and you round up everybody in the community and you put them in prison for 30 days or 13 days, right? And you say, somebody here is bad, right? Most of you, y'all are great. You're law-abiding citizens. But somebody here is bad and you might be planning to do something bad. Wouldn't we say that's an infringement of their Fourth Amendment rights? Right? So the law-abiding citizen, just because it's 13 days or 30 days, doesn't mean that it's like de minimis, right? And so you're only in the pokey for 30 days, right? We would say that's an infringement of the Fourth Amendment, right? Even if it was designed to protect the public, right? Because we're concerned about what these two people might do. We don't know which two. Well, I think the answer perhaps boils down to the fact that these constitutional rights were enshrined with the understanding that they had at the time of founding. And so when you look at the Fourth Amendment, right, it protects public safety, but it really protects the individual from unreasonable search and seizure. And then you look at the Second Amendment, you look at the distinct history of the Second Amendment, going back to the English Bill. It doesn't protect the individual, is your argument. It certainly protects the individual, but it doesn't, perhaps not in the absolutist sense. Well, neither does the Fourth Amendment in the absolutist sense, right? It's not absolute. It's a question of reasonableness, right? It even has reasonableness built into it. But nobody would say that putting the guy in prison for 30 days, or all citizens for 30 days, just so we can try to figure out if there's a bad apple in the bunch, wouldn't be an infringement of the Fourth Amendment. No, and if reasonableness is the touchstone, then... It is in the Fourth Amendment. There's no reasonableness carved out for you in the Second Amendment. The Second Amendment is more absolute than the Fourth. But to the extent there's a reasonableness in the Second Amendment, it's reflected in the history and tradition. And that's what the state is relying on going back to. Tell us succinctly, what is the history and tradition you keep referring to? Preventing dangerous individuals from obtaining deadly firearms? That's a generic concept. I guess you've already admitted you have no Founding Era statute that's an analog to what Maryland does here. We were unable to find it, but look at the Bruin footnote 9. The Bruin in the body of... You read footnote 9 as a comprehensive test for all Second Amendment cases, and it's not tied to the public carry context of the Bruin case. I agree, and I look at footnote 9 as just... That was a question. I wasn't positing one way or the other. But the state looks at footnote 9 as an extension of just generally applicable constitutional principles that say, when you have substantive limitations built into a right, you can have legal mechanisms to enforce them. And that is what Bruin footnote 9 says, is that you can ensure that law-abiding responsible citizens are the only ones who bear arms in the jurisdiction by having upfront background checks, fingerprints, firearms training, mental health evaluations or checks. And Bruin, in its vast historical analysis, yes, it went to the substantive limitations on public carry. But then when it comes to footnote 9, they don't have that same, any sort of historical analysis. They say it as if it were just something that we take for granted. And it kind of is because it's part of the generic constitutional landscape. You can see that in voting basis, we have voter registration. We have photo ID laws that this court has approved of. And what are those but ways of beforehand ensuring that the substantive limitations can be enforced? And so that's the way that this case should be viewed. Okay. Excuse me, Mr. Dietrich. The Supreme Court in Bruin, in the majority opinion, was addressing surety laws that existed at the time of the founding and referenced the fact that they only imposed a de minimis burden on the right to carry. Isn't that correct? I believe that's correct. Okay. Um, why then don't we have to remand this case to the district court to determine exactly what this burden is? I mean, is it a de minimis burden like the surety statutes? Or is it something bigger? Apparently, there were restrictions back in colonial times of a different type of restriction on people's right to carry. Uh, why do we want to opine at the appellate level when the district court has never considered this? The district court decided the case under Colby and used the Heller analysis as modified by Colby or as interpreted by Colby. So why do we want to jump in and take this case when the district court hasn't had a chance to see if there are historical analogs? Just because you can't come up with them now doesn't mean there aren't any. And, um, it seems that the law is best served when there's an opportunity for evidence to be taken, the case to be played out under the proper analysis, which wasn't done. The proper analysis was not done because the judge didn't have the benefit of drawing. Well, I would agree that if this court is inclined to take that path, yes, it should be remanded for that consideration. What do you do with footnote six where it says, the Supreme Court says, courts are entitled to decide a case based on the historical records compiled by the parties. Right, that we're, the district courts, you know, not under an obligation to go to the Library of Congress and flip through the statute books, right? We're not required to do that independent of you, right? We rely on you. And so you've compiled, and this is not a critique of you, right? You've done, I'm certain, the best you can do, but we're entitled to rely based on the record compiled by the parties. Yes, you can rely on that. That's what footnote six, that's correct in Bruins, says. But there, it's always been our position that there is a historical tradition in the substantive limitations that this statute furthers. And with regard to the burden, the administrative burden, the district court already opined on that and said that this was a de minimis burden. And so... Right, but the district court did that under an entirely different analysis. It was a pre-Bruin analysis. If this court is inclined to remand... And it was, excuse me, it was an analysis that the Supreme Court expressly rejected in Bruin. They said that we're not going to have this kind of balancing test. And that's exactly what the judge did because she didn't have the benefit of Bruin. So why would we then try to cobble the law here without giving the district court the first shot at analyzing the case under the existing Supreme Court precedent? Your Honor, I'm certainly not going to stand in the way but that's what this court needs to decide. And our position is that the district court did decide that, said this was de minimis with respect to the burden itself on applicants. Everybody who is law-abiding, responsible citizen can get an HQL. It's a shall issue regime. And Your Honor, I see my time is up. Is there any other... So, I mean, I understand why you, you know, taking the position to affirm but I'm, I guess this is neither here or there but I would have kept looking in your brief for an alternative prayer for relief that if we disagreed or following Judge Keenan's line that we would remand. I'm just curious why you didn't leave that in the alternative. Because there was a robust... I mean, Frank, there's a robust record down below that presented evidence on what we believe to be the only issue that was in terms of an evidentiary issue which was what is the administrative burden on applicants? And that evidence is there. How many people were able to get HQLs? You know, how long it took, what the costs were and all of those were available for the district court. And again, the state wouldn't stand in the way of this court remanding if this court believed that it needed additional evidence or different evidence to decide the case. Thank you very much. I just had one factual question. You seem to rely a number of times on this idea that the HQL was associated with a decrease in homicides in large urban counties in Maryland. You remember this sort of argument? But you do that excluding Baltimore City which is also a county. I know that's confusing. Baltimore City County. But Baltimore City County is like 70% of the murders in those counties, right? So it seems odd to say it's associated with a decrease in these three counties but 70% of the murders happen in Baltimore City County in Maryland. And that increased when the HQL came out. Can you help me understand how that, you seem to rely on that as sort of evidence that this works. But when you put the numbers together, it's actually associated with an overall increase in murders in Maryland. And I'm just trying to understand, you seem to rely on it. It doesn't, it seems to cut the other way. Can you help me understand that? Sure. That distinction was made basically because of the uptick in crime in general in Baltimore City after the unrest after the death of Freddie Gray in 2015. But it's remained like, in fact, the murder rate in 2020 is higher than it was in 2015, right? So that would, excluding Baltimore would make sense if it popped up and there's this unique instance and then it decreased again. But instead it's remained at indeed higher levels than in 2015. So excluding Baltimore City from the question of association which obviously correlation is not causation anyway but it seems to get the analysis like absolutely backwards. But you're getting into areas where I feel I'm not qualified but one way may say that the effects- Yeah, I don't think the expert was qualified either. And that's sort of part of the rub that I've got. I mean, I think he's like just pulling data, right? If you create a correlation by taking out 70% of the data that doesn't look like actual statistical analysis. But where I was going is I think that the effects of that unrest from 2015 are still ongoing, still very much ongoing. And so you're still seeing the effects even through 2020 which is where the data stops in the record below. But it's just social scientists reflecting factors that they felt were outliers and skewed the data. And it's there for the purpose both pre-Bruin and post-Bruin to show that this law has an effect. And so it furthers that substantive limitation, that historical tradition of keeping guns out of the hands of dangerous people. And that it works because I think that's part of the holistic analysis of that second prong of the Bruin footnote nine test which is, is this an onerous law in terms of does it diminish or extinguish the right? Is it too onerous? And if it's something works, if something is shown to work, be correlated to something that works, then that is part of the analysis in terms of whether it's too onerous. Thank you. All right, thank you very much, Mr. Dietrich. Mr. Dardenne, you have some rebuttal time. Thank you, Your Honor. Briefly, I would like to just address a few of those points starting with a point that Judge Keenan made that is absolutely correct. Bruin did away with the balancing tests that had been adopted by most of the circuit courts including this court in Colby-Anbaum. And in doing so, it rejected the idea that the extent of the burden has to be weighed against what government interest is being effectuated and whether or not it is effectual in advancing those interests. And that is precisely what the government is arguing here. Whether or not the burden is de minimis or is extensive or anything along those lines is not a relevant concern under the Bruin test that focuses on the history and tradition and whether or not it is an historical analog to the law that is being considered. Here, the state has already admitted that there is no historical analog for this type of law. Instead, they retreat to the individual component parts which as the state has already said cannot be severed. However, those individual component parts still do not have this historical basis that the government says that they do. For example, the state relies on the idea that individuals will be trained when they showed up for a militia muster. And that is absolutely correct. That was the point of showing up to the militia muster. However, can you help me for a second? Can you help me? I understand that severability is maybe not an issue given where we are. But do you contend that if the law just required a fingerprint to buy a gun, which is not this law, I totally get, but it required a fingerprint to buy a gun, so you had to either at the store or bring in a fingerprint card, that that would necessarily violate the Second Amendment? No, I'm not sure. I think it would depend on how that law was structured and what exactly was being done with the fingerprinting. I know here that- Well, Mr. Nardone, I think you need to answer the question though, because what if the law required fingerprinting to determine whether or not you were prohibited by law from possessing a firearm, such as a prior felony conviction? And what if you were required to just bring that up to the counter to show that you passed the fingerprint check? No waiting period. You passed the fingerprint check. Would that be okay? I don't think it is, Your Honor. Why not? Under the Fourth Amendment, the government cannot compel you without a warrant to provide your fingerprints. Supreme Court has already held that you cannot condition the waiver of one constitutional right to be able to exercise another. You know, the Supreme Court, though, seemed to think that fingerprinting could be okay. If you look at footnote nine, it clearly doesn't agree with you that fingerprinting is a compelled seizure of the person. There's no way to reconcile that statement by you with footnote nine. So your answer is that you just cannot, the state cannot require you to present a fingerprint card that's been stamped okay. I don't think that is- I don't think the court considered whether or not fingerprinting could be okay. In footnote number nine, it listed, among other things, parts of firearm regimes that were not at issue in that court. To the extent it discussed anything, it was discussing whether or not a shell issue regime would still be subject to constitutional challenge. Just so I understand that, and so Judge Keenan's hypothetical was different from mine, but to go back to my hypothetical where you just have to be fingerprinted, there's no background check that's happening ex ante. It's not a pre-clearance. You just have to submit fingerprints. Your argument is not that that violates the second amendment, but that that might well violate the fourth amendment. Your Honor, I would say that it presents the inappropriate choice of which of your fundamental rights you can insist on asserting against the government. Either you can insist on your right to be free from a seizure and present your fingerprints, or you can insist on your right to possess a firearm in the home for self-defense, but you cannot do both. You think that's different from a driver's license, right? The driver's license would be okay, but the fingerprints are not? I do, Your Honor, absolutely. So, Mr. Nardone, you're saying that in your scenario, then a convicted murderer, someone who'd committed several murders but had been released on parole, could not be blocked from obtaining a firearm under any scenario by the state? Absolutely. Fingerprinting requirement or anything else, the convicted murderer should be able to get a gun. Murdered his whole family, right? But he can still get a gun? Absolutely not, Your Honor. As I said, we're not here challenging background checks. Background checks can and have been done without fingerprints for decades. And in fact, the- So how long can a background check take then to not constitute an undue burden on the exercise of the Second Amendment, right? Your Honor, I think that depends- Is a 30-day waiting period for a background check unconstitutional in your view? I think it almost certainly is, Your Honor. And also here- Okay, what would meet constitutional standards in your view then for a background check in terms of time? I don't think that the time alone can be the matter in which we judge these unless the time becomes so long as it is designed to- To what? Why not- Why wouldn't you say arguably, right? I mean, all these are hypotheticals, right? We don't have them in this case. But why wouldn't you say, listen, so long as it doesn't interfere with your right of self-defense, then that might be the type of a delay that's permissible. And what time would that be? Well, that'd be the time in which you would remain in the store, right? So if you're at the gun store buying a gun and it takes them a half an hour to run your information through a background check, you're in the gun store, your right of self-defense is relatively well protected, we think otherwise. I mean, so that might be enough. But if you have to leave and go home, right? As soon as you have to leave, then your right of self-defense has been infringed. Well, I think that's the correct lens with which we have to review these things because just simply saying something is a background check or labeling that way is insufficient. We have to look at the mechanism that's being applied and the effect of it. And so, to your Honor's point, someone that goes through a NICS check over the phone, the mechanism there is a phone call and it effectuates a five to 10 minute wait. Here, the mechanism is something substantially larger. Okay, Mr. Narvone. Narvone, I'm out of my time, I apologize. Yeah, let me ask you then. You can answer Judge Keenan's question. Yeah, let me ask you then about Justice Kavanaugh's concurring opinion with Justice Roberts when they both said that fingerprinting essentially is a legitimate requirement of the state. How does that affect your Bruin analysis? Because they joined the Bruin opinion, I mean, have a concurring opinion, but they're saying that essentially fingerprinting is okay? Your Honor, I... And those were two members of the court. They weren't, Your Honor. That's exactly right. It was two members of the court. That opinion did not command a majority and it is not part of the holding of the court. And in fact, the fact that they would address this separately in a concurrence demonstrates that it is not the way that the majority opinion is to be interpreted, else it would have been in the majority opinion. Well, it wasn't, no, it wasn't. Sorry, Your Honor. It was in footnote nine, wasn't it? Your Honor, I don't think footnote nine goes that far. I don't, but more importantly, the concurrence is directed at shall issue carry regimes, which are not at issue here and have different considerations when the constitutionality is determined because there was a different historical tradition of possessing a firearm in the home than there is for carrying a firearm outside of the home. Your Honors, unless there are any further questions. Just so I'm sure factually in Maryland, if I want to go to the gun store in Maryland and purchase a handgun today, I would have to have this handgun permit in hand to get to the gun store. But to make the purchase, I have to go through an entirely separate process of background checks and all that stuff to actually purchase the firearm. That's correct, Your Honor. The process starts when you decide you wish to purchase a firearm. At that point, you need to take the time to schedule a course, go get the fingerprinting done. After that's finished, you can submit your handgun qualification license application, which starts the 30-day window. After you receive your handgun qualification license, you then have to go to the store and fill out what's known as a 77-R form. Then that is submitted to the state police and that starts the next seven-day waiting period. So it's 37 days? It's 37 days total? 37 days from the day that you submit your handgun qualification license application if the statutory strictures are abided by. That's correct. However, you have to start the process before that because you have to obtain the training certificate and the fingerprints before you can submit the application. So in order to actually purchase the firearm, as I think it is true in basically every state, then that separate process will detect the felons, people that are subject to mental detention orders, domestic violence orders, all those sorts of things. That would be detected at that point before you could actually purchase the firearm. That's correct, Your Honor. And in fact, that carries another $15. Anything else? All right, thank you very much. We're going to come down and brief counsel and then we'll move on to our second case.
judges: G. Steven Agee, Julius N. Richardson, Barbara Milano Keenan